## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**JIMMY F HARRISON**                                                    **PLAINTIFF**

**V.**              **CASE NO. 4:21-CV-00076-LPR-ERE**

**COMMISSIONER of**
**SOCIAL SECURITY ADMINISTRATION**                   **DEFENDANT**

## <u>RECOMMENDED DISPOSITION</u>

This Recommended Disposition ("Recommendation") has been sent to United States District Judge Lee P. Rudofsky. Either party may file written objections to this Recommendation. Objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation. If no objections are filed, Judge Rudofsky can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

## I.      INTRODUCTION

On November 8, 2018, Jimmy Harrison filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning November 21, 2017. (Tr. at 15). His claim was denied both initially and upon reconsideration. *Id*. On January 16, 2020, he filed a Title XVI application for supplemental security income, also alleging disability beginning November 21,

1

2017. *Id*. An Administrative Law Judge ("ALJ") considered both claims at a hearing on March 4, 2020. *Id*. At the hearing, Mr. Harrison amended his onset date to September 30, 2018, which matches the date he was last insured for purposes of his Title II claim. *Id*. The ALJ denied both applications on April 30, 2020. (Tr. at 28).

Following the ALJ's order, Mr. Harrison sought review from the Appeals Council, which denied his request for review. (Tr. at 1). Mr. Harrison seeks judicial review of the ALJ's decision, which now stands as the Commissioner's final decision. For the reasons stated below, the Court should reverse the ALJ's decision and remand for further review.

## II.   THE COMMISSIONER'S DECISION

The ALJ found that Mr. Harrison had not engaged in substantial gainful activity since the alleged onset date of November 21, 2017.[1] (Tr. at 18). At Step Two, the ALJ found that Mr. Harrison had the following severe impairments: mood disorder, bipolar disorder, anxiety disorder, panic disorder, personality disorder, post-traumatic stress disorder, moderate stenosis of the lumbar spine, osteoarthritis and disc bulges. *Id*.

---

[1] Although the ALJ's order initially acknowledges an amended onset date of September 30, 2018, the ALJ appears to evaluate both of Mr. Harrison's claims using the initial onset date of November 21, 2017. Neither of the parties address this apparent discrepancy. Because the undersigned ultimately recommends that the ALJ's decision be reversed and remanded, regardless of the applicable onset date, this opinion will not attempt to reconcile the dates.

After finding Mr. Harrison's impairments did not meet or equal a listed impairment, the ALJ determined that he had the residual functional capacity ("RFC") to perform work at the light exertional level, except that he could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; cannot work in extreme heat, cold, or humidity; and could perform unskilled work with simple, direct, and concrete supervision where social interaction is incidental to the work performed. (Tr. at 19).

Relying on the testimony of a Vocational Expert ("VE"), the ALJ found that Mr. Harrison was unable to perform any of his past relevant work as a janitor, resaw operator, industrial cleaner, or industrial maintenance repairer. (Tr. at 26). The ALJ found that Mr. Harrison's RFC would allow him to perform jobs that exist in significant numbers in the national economy, including housekeeping, packing-line worker, and injection-molding-machine tender. (Tr. at 27). The ALJ concluded that Mr. Harrison was not disabled from November 21, 2017, through the date of the ALJ's decision. (Tr. at 28).

## III.    DISCUSSION

### A.    Standard of Review

In this appeal, the Court must review the Commissioner's decision for legal error and determine whether the decision is supported by substantial evidence on the record as a whole. *Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016) (citing

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). "Substantial evidence" in this context means "enough that a reasonable mind would find [the evidence] adequate to support the ALJ's decision." *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009) (citation omitted). In making this determination, the Court must consider not only evidence that supports the Commissioner's decision, but also evidence that supports a contrary outcome. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). The Court will not reverse the Commissioner's decision, however, "merely because substantial evidence exists for the opposite decision." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) (citation omitted).

**B.    Overview of Relevant Facts and Medical History**

Mr. Harrison filed the instant application for benefits following a previous unfavorable disability decision that was issued on November 20, 2017. Although his alleged onset date is November 21, 2017, he told the ALJ that he had been coping with the effects of his mental impairments since long before that time. Mr. Harrison testified that he was diagnosed with bipolar disorder when he was 17 years old and had been admitted numerous times for inpatient treatment in psychiatric hospitals across Arkansas before the alleged onset date. (Tr. at 66, 71-72). He stopped working in 2013 due to his bipolar disorder as well as post-traumatic stress disorder, which he believed stemmed from witnessing several traumatic work-related incidents.

Some of the medical records are copied from his previous application, including treatment records from The Bridgeway in North Little Rock from September 2014. Records show that Mr. Harrison presented for treatment at Bridgeway with suicidal and homicidal ideations after he got into an altercation during a 21-day court-ordered substance abuse treatment program. (Tr. at 370). At discharge, his GAF score was 45, but he was in good and stable condition with prescriptions for Depakote, Lithium, and Vistaril. (Tr. at 371). In October he started seeing William Berry, M.D. as his primary care physician. (Tr. at 394). In May 2015, he was having panic attacks and needed a medication adjustment, so he started Seroquel. (Tr. at 392-93). In October 2015 he presented with agitation and anxiety after running out of his medications, and notes show he needed a higher dose of Seroquel. (Tr. at 387). His medications were adjusted in December 2015 and then again in February 2016 after he reported continued anxiety, agitation, and trouble sleeping. (Tr. at 382-86). In March 2016, he was taking Buspirone, Lithium, Depakote, Seroquel, and Wellbutrin on a daily basis. (Tr. at 380-81).

In April 2016, Mr. Harrison began counseling and medication management treatment at Counseling Associates. (Tr. at 402). He presented with chief complaints of substance abuse, depression, and anger. He admitted to a history of physical and verbal aggression, with feelings of anger occurring three to four times per week. He reported increasing anxiety on a daily basis that he described as "freaking out

transitioning to anger," daily issues with depression of varying intensity with passive suicidal ideation, hallucinations, oppositional behavior secondary to drug and alcohol use, and an inability to focus when angry. He reported having experienced manic episodes since he was a teenager, with symptoms of increased energy, no sleep for three or four days, frequent impulsive thought content, with risk taking, racing thoughts, irritability, and an increase in drug use. He explained that he did not know how frequently these episodes occurred, but "others can pin point it" and know pretty quickly what is happening. (Tr. at 403-404). He reported an obsession with safety since working at a sawmill and described having nightmares and flashbacks of traumatic events. He admitted to having a lifetime difficulty with keeping relationships, and he described past behavior of trying to fit in but having paranoia of people talking about him or having something against him.

At his initial psychiatric assessment with Marcia McGlone, APRN, in May 2016, he stated that he was unemployed due to anger and aggression, and he reported a felony on his record following two episodes where he lost complete control of his anger. (Tr. at 419). He reported a 90-pound weight gain since starting Seroquel. He was prescribed Abilify and advised to discontinue his Seroquel and Lithium.

A consultative mental diagnostic evaluation by Christina Couch, Psy.D., dated August 6, 2016, was also pulled from the prior case file. At that time, Mr. Harrison reported that his medications were usually managing his mania symptoms, but he

was experiencing more symptoms of depression, including low energy and motivation, taking frequent naps, hopelessness, impaired concentration, memory loss, and difficulty getting out of bed some days. He reported anxiety, panic, and paranoia when in public and when in the car, and he suffered panic attacks with associated anger when he felt "under pressure," which would occur at least once a week for 20-30 minutes at a time. (Tr. at 425). His mood was often irritable and angry, and he experienced hypervigilance and distrust of people in the community.

Counseling continued in 2016 and 2017 with varying degrees of progress and regression between appointments. In February 2017, he was functioning better and considered returning to work. (Tr. at 648). In March 2017, he complained of increased anxiety and was noted to have marginal insight and judgment. His medications were adjusted. (Tr. at 667). In May 2017, he reported that he was unable to return to work because of increased anxiety with panic attacks. (Tr. at 665). His treatment providers found that he was socially isolated, but he reported that his medication and therapy had been effective at improving his mood and functioning.

On November 21, 2017, the alleged onset date, Mr. Harrison seemed to have good insight and judgment and was given a fair prognosis. (Tr. at 679). In January 2018, he began counseling with Laura Brinker, LPC. She described him as symptomatic, but stable, and noted that he watched TV as a coping skill but had little other activity. (Tr. at 675). In February 2018, he was gaining insight and reported a

7

desire to get more involved in outdoor activities. (Tr. at 672). In April 2018, he had made no significant progress and remained symptomatic. (Tr. at 469). The next month, his mood had improved slightly, and he reported spending a lot of time with family and fishing. (Tr. at 462). In June 2018, he reported no change, but he and Ms. Brinker discussed an upcoming supportive employment program. (Tr. at 460). Two months later, he remained symptomatic but continued to gain insight. (Tr. at 457).

In September 2018, Mr. Harrison regressed, and his anxiety worsened. (Tr. at 454). In October 2018, he seemed to have made slight improvements but reported continuing nightmares. (Tr. at 451). In November 2018, he was visibly agitated and described increased anger and sleeplessness. (Tr. at 445). By January 2019, he remained symptomatic and his prognosis was guarded. (Tr. at 542). In February 2019, he reported being unable to be in public, including going to church. (Tr. at 539). In March and April 2019, he reported that his mood was overall improved, and he was starting to do some work activity around his father's farm. (Tr. at 527). By late April, his counselor gave him a good prognosis, noting significant progress and a "greatly reduced" PCL-5 score. (Tr. at 521). In May and June of 2019, he continued to deal with anger issues and outbursts but showed improvement overall and was "able to function in a work environment on his Dad's farm." (Tr. at 853).

On July 10, 2019, Mr. Harrison reported that he had stopped taking some of his medication and that he was continuing to have problems with his anger. (Tr. at

833). On July 26, 2019, he was admitted for voluntary inpatient treatment due to suicidal and homicidal ideations. (Tr. at 876). He was guarded and paranoid, stating, "I do not know you well [and] do not want to give my information." (Tr. at 870). He denied any medication regimen and stated he had never been compliant with medications upon discharge. He refused to disclose information about the people he was experiencing homicidal ideation towards but stated that they had hurt his family and daughters. His attention span and concentration were significantly impaired, and he had poor insight and poor judgment. He admitted to having poor sleep, anger, and irritability for more than seven days when he was sober, spending a lot of money, and giving away his truck to one of his friends. (Tr. at 871). He stated that he had stopped medications after he was feeling better and he admitted to having a drinking relapse several days before his admission. *Id*. He was diagnosed with bipolar disorder, current episode mixed, severe, without psychotic features; alcohol abuse; and depression with suicidal ideation. (Tr. at 885). He was placed on Lithium and was stable at discharge on July 31, 2019.

Two days later, on August 2, 2019, he arrived at the emergency room in a police vehicle, with complaints of being "angry/insane." (Tr. at 719).[2] Clinical notes show he was unkempt and hostile, but cooperative. Mr. Harrison advised that he

---

[2] Mr. Harrison testified that on two occasions in 2019 his father called the sheriff's department because Mr. Harrison was making threatening comments to him about hurting himself and others. (Tr. at 69-70).

"was unaware that he was supposed to get his prescription filled and was off lithium" for two days. (Tr. at 719). He was discharged shortly thereafter and directed to follow up with Counseling Associates.

On August 7, 2019, Mr. Harrison's counselor reported that he appeared to be having a manic episode. (Tr. at 829-30). Although he reported taking his medication, he was restless, easily irritated, and his thoughts were hard to follow. *Id*. He reported being unable to remember large parts of his life, and "explained that he was sitting at the table with his daughters and ex-wife and then suddenly they were gone." *Id*. He also brought in a box full of papers and notebooks that he wanted his counselor to look over, but "[s]ome of these were just scribbles or had nothing to do pertaining to therapy." *Id*. Following an incident where Mr. Harrison threatened his father, the sheriff took him to the Yell County Detention Center and then admitted him to inpatient treatment on August 21, 2019, for another seven days. (Tr. at 73-74, 551).

When Mr. Harrison resumed therapy on August 29, he told Ms. Brinker that the hospital stay had been helpful, but she noted that he remained symptomatic, struggled organizing his thoughts, and his anger was easily triggered. (Tr. at 818). The prognosis was guarded. *Id*. On September 3, his therapist gave him a fair prognosis, finding that his progress was limited by his anger and poor interaction skills. On September 5, Mr. Harrison stated that Seroquel was "really helpful" for his mood, but he also reported being fired from his job the day before because of his

inability to control his anger. (Tr. at 810). He reported that he was still drinking alcohol even though he knew he was an alcoholic. On September 16, he discussed moving out of his parents' house and meeting with a prosecuting attorney to discuss charges his father had brought against him the month before, and stated "that his father misconstrued what happened and that he never threatened to harm him." (Tr. at 802). He told his therapist that he was not going to stop drinking alcohol and that "I reserve the right to drink when I want to." *Id*. His prognosis was, again, guarded.

Two days later, on September 18, 2019, Mr. Harrison voluntarily admitted himself for seven days of inpatient therapy due to suicidal and homicidal ideations with irritability and impulsivity. (Tr. at 905). He reported having severe anger outbursts, racing thoughts with difficulty speaking, several road rage incidents, and "possible charges of terroristic threatening towards his father." *Id*. He described recently getting angry and being tased by police. He reported suicidal ideation with a plan to eat poison berries and homicidal ideation towards his girlfriend's husband. He was discharged a week later in stable condition. (Tr. at 906-07).

In October 2019, Mr. Harrison reported that he was still drinking and was often angry, but he was working on not lashing out. (Tr. at 794, 798). In November 2019, his therapist wrote that he continued to struggle with mood control and his progress was limited by his anger control issues. (Tr. at 790). In December 2019, he and his counselor discussed how his angry outbursts could be linked to mania. (Tr.

at 786). He discussed not wanting to take his medication but realizing that it was helpful. He also discussed having racing thoughts and struggled explaining his problematic behavior.

The last record from counseling is dated February 17, 2020. At that appointment, he seemed stable and reported feeling good overall. At his administrative hearing, Mr. Harrison testified that he had been doing better mentally and was not having outbursts or thoughts of self-harm. (Tr. at 75).

### C.   Mr. Harrison's Arguments on Appeal

Mr. Harrison argues that the ALJ's decision to deny benefits is not supported by substantial evidence and challenges the ALJ's decision on multiple grounds. After a careful review of the record as a whole, the Court finds that the ALJ erred in evaluating Mr. Harrison's mental impairments by attributing his limitations to noncompliance with treatment recommendations from his healthcare providers. The ALJ failed to develop medical evidence regarding the crucial issue of whether Mr. Harrison's noncompliance was attributable to his mental impairments, and this error tainted her assessment of Mr. Harrison's credibility and determination of his RFC. For these reasons and several others discussed below, the case should be remanded

because the ALJ's decision is not supported by substantial evidence, including necessary medical evidence.[3]

### 1. The ALJ Erred in Evaluating Mental Impairments

The Court finds the ALJ erred in attributing Mr. Harrison's symptoms from his mental impairments to noncompliance with treatment—specifically, his failure to regularly attend counseling, take medications as prescribed, and abstain from alcohol. The ALJ determined that when Mr. Harrison was taking his prescribed medications and attending counseling, his mental impairments were controlled and he exhibited effective daily functioning. See *Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016) (mental impairments that can be controlled by treatment and medication cannot be considered disabling). This determination is not supported by substantial evidence.

First, substantial evidence does not support the ALJ's conclusion that Mr. Harrison's symptoms were controlled when he was taking medication as prescribed and attending counseling. (Tr. at 24). Mr. Harrison's medications were adjusted on multiple occasions during the relevant time period, an indicator that his medications were not always appropriately managing his symptoms. Indeed, clinical notes

---

[3] Although Mr. Harrison also makes arguments regarding the ALJ's assessment of his physical impairments, the argument that provides the basis for reversal in this case relates to his mental impairments, so the Court limits its discussion to those impairments. See *Noerper v. Saul*, 964 F.3d 738, 741 (8th Cir. 2020) ("Although our detailed discussion is targeted, we have considered the claimant's arguments and the record as a whole as to all of her impairments and their cumulative effect on her limitations.").

describe him as struggling with symptoms of anger, mania, anxiety, and depression even during periods when he was consistently attending therapy and reportedly taking his medications as prescribed. Consistent with his hearing testimony, Mr. Harrison's therapy notes demonstrate a significant increase in the frequency of his counseling appointments beginning in early 2019, months before his hospitalizations that occurred later that year, indicating that Mr. Harrison, his treatment providers, or both believed his condition warranted progressively intensive therapy during the relevant time period. Despite the ALJ's assertion his medications were particularly effective at addressing mania, the medical record abounds with persistent reports of uncontrolled anger that his therapist linked to mania. (Tr. at 786). To the extent the ALJ found that the periods of improvement evidenced by the record suggest Mr. Harrison's impairments were controlled or controllable by medication, the Court is mindful that "one characteristic of mental illness is the presence of occasional symptom-free periods." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). So, symptom-free intervals do not necessarily negate a finding of disability. *Id*. In this case, the ALJ failed to consider the waxing and waning nature of mental illness, focusing too intently on periods of improvement while ignoring worsening and severe symptoms in the process.

Second, the record does not support the ALJ's finding of consistent noncompliance with medications and treatment. The ALJ decided to discount Mr.

Harrison's credibility in large part because of his failure to comply with treatment recommendations concerning therapy. The ALJ's decision to discount Mr. Harrison's credibility heavily relied on a perceived conflict between Mr. Harrison's testimony that he generally attended therapy once a month, and his therapy records which showed "visits at varied intervals, some several times per month and other occasions where the claimant went several months and even 6 months without treatment." (Tr. at 24).

It is not clear, though, how the ALJ came to make this finding, as the record does not demonstrate that Mr. Harrison went six months without therapy after beginning treatment at Counseling Associates. The ALJ may have assumed this based on a six-month gap in the administrative record between Mr. Harrison's initial presentation at Counseling Associates in April 2016 (Tr. at 402-18), and the first record of individual therapy in the current administrative record from October 2016 (Tr. at 629-31). The parties do not address why the record does not contain therapy records from the time period between April and October. The Court notes, however, that the 2017 ALJ decision specifically discusses the content of therapy notes from this time period (Tr. at 105), and the exhibit list from that administrative record indeed lists treatment records from Counseling Associates dated during this time period. (Tr. at 114). As for therapy notes included in the current record, the Court notes that Mr. Harrison's treatment plan described individual therapy at a frequency

of one to two times per month at both his initial evaluation in April 2016 and at a "90-day review" conducted in October that year. (Tr. at 416, 641). In the October review, his counselor noted that he had been attending his scheduled appointments. (Tr. at 641). There is no other potential six-month gap in therapy supported by the record.

Moreover, Mr. Harrison's "once a month" testimony was made during a discussion regarding his treatment with Laura Brinker, which began in January 2018. When asked how often he saw her, he stated that "once a month has been regular for since I've been going," but if they needed to meet more often, he would have appointments more frequently. Around the time of the hearing, he had been seeing Ms. Brinker twice a month. (Tr. at 67). The record clearly shows a monthly treatment frequency dating back to that time.[4] Although the record reflects that the frequency of Mr. Harrison's therapy visits varied to some degree in 2017, his treatment plan specified a monthly frequency dating from the initial evaluation through the end of 2016—a frequency that was reiterated by both Mr. Harrison and his treatment providers at multiple points during 2017 as well. (Tr. at 651, 678, 681). Mr. Harrison's testimony regarding therapy was not necessarily inconsistent with the medical record.

---

[4] See, e.g., records of counseling sessions dated 1/25/18 (Tr. at 674); 2/22/18 (Tr. at 470); 4/6/18 (Tr. at 467); 4/27/18 (Tr. at 464); 5/18/18 (Tr. at 461); 6/22/18 (Tr. at 458); 8/7/18 (Tr. at 455); 9/5/18 (Tr. at 452); 10/3/18 (Tr. at 449); 10/31/18 (Tr. at 446); 11/28/18 (Tr. at 443).

In fact, Mr. Harrison's longitudinal record of treatment with Counseling Associates demonstrates a remarkably consistent therapy attendance record spanning multiple years and often involving several therapy sessions per month. Not only did the ALJ place undue weight on Mr. Harrison's offhand statement and fail to consider how the testimony could be consistent with the record, she also erred in finding noncompliance with his treatment providers' recommendations regarding therapy. This error is especially notable because, despite his regular therapy attendance, Mr. Harrison still had multiple serious relapses that resulted in inpatient hospitalizations.

Mr. Harrison also testified that sometimes his Medicaid did not cover all of the costs of his treatment. (Tr. at 86-87). The ALJ dismissed this testimony because she found there was no evidence in the record that he had discussed the situation with his treatment providers "or otherwise availed himself of and exhausted all possible resources available to obtain medication." (Tr. at 25). Although Mr. Harrison was quite candid at the hearing about often forgetting to take his medication, at least one treatment note from Counseling Associates does address an insurance coverage issue related to his Lithium prescription. (Tr. at 824).

Third, and most importantly, the ALJ failed to consider whether Mr. Harrison's noncompliance may be a product, rather than a contributing cause, of his mental impairments. The Eighth Circuit has recognized that "a mentally ill person's

noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009). Although substantial evidence supports the ALJ's finding that Mr. Harrison knew he needed to comply with his medication regimen, the ALJ ultimately "failed to make the critical distinction" between Mr. Harrison's awareness of the need to take his medicine and the question of whether his noncompliance was a medically-determinable symptom of his mental illness. *Id*.

For example, numerous clinical notes cite Mr. Harrison's poor judgment and insight, which may be symptoms of his mental disorders and could be directly related to his noncompliance. See, e.g., *Reals v. Astrue*, No. 08-3063, 2010 WL 654337, at *2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from anosognosia, or poor insight. Evidence suggests that poor insight is a manifestation of the illness, rather than a coping strategy. . . . This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness."). The Court is not in a position to determine the relationship, if any, between Mr. Harrison's symptoms of mental illness and his noncompliance with treatment recommendations. However, the ALJ should have taken this into consideration

before rendering her opinion. "Whether severe mental illness has resulted in justifiable noncompliance is a fact-intensive issue." *Hensley v. Colvin*, 829 F.3d 926, 935 (8th Cir. 2016). In this case, the ALJ's failure to develop the record resulted in a complete lack of medical evidence addressing whether Mr. Harrison's noncompliance resulted from something other than his mental illness. The ALJ's implicit determination that Mr. Harrison's "medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law." *Pate-Fires*, 564 F.3d at 946-47. The ALJ's failure to develop medical evidence regarding this crucial issue constitutes reversible error. See *Grindley v. Kijakazi*, 9 F.4th 622, 629-30 (8th Cir. 2021) (ALJ required to seek clarifying evidence where crucial issue is undeveloped).

## 2.   The ALJ Erred in Evaluating Credibility and Determining RFC

Given that Mr. Harrison's noncompliance with treatment and medications may not be an appropriate reason to discredit him, the Court must assess whether substantial evidence exists that would nevertheless support the ALJ's decision to disregard his subjective complaints. See *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (when evaluating subjective complaints, ALJ must consider medical evidence as well as evidence relating to claimant's daily activities; duration, frequency, and intensity of symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions).

The ALJ found that Mr. Harrison's activities of daily living were inconsistent with his complaints. During the day, Mr. Harrison mostly watches television, but he can attend to his own personal care, prepare sandwiches, and help his mother with household chores for about an hour every week. He has a driver's license and he will briefly shop in stores for things like bread, milk, and cigarettes. He does not like to socialize, as he has issues getting along with others, but he does attend a small church on a weekly basis. These "minimal" activities are consistent with chronic mental disability and do not support the ALJ's credibility finding. *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001).

Although the ALJ found that Mr. Harrison's ability to work before 2013 detracted from his credibility, his work record actually supports the credibility of his complaint. *Id*. It is also worth noting that his father was the manager at the Deltic Timber mill where Mr. Harrison spent most of his career. (Tr. at 54). See *Hutsell*, 259 F.3d at 711 ("Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.") (cleaned up). Mr. Harrison's father was responsible for assigning him to various jobs over the course of his employment, yet Mr. Harrison was still eventually terminated over a dispute with his supervisor. *See id*. ("Such individuals may be much more impaired for work than their signs and symptoms would indicate.").

20

Evidence regarding side effects from Mr. Harrison's medication is mixed. Although his January 9, 2019 Function Report (Tr. at 299) lists no side effects, a Pain Form that Mr. Harrison filled out on the same date (Tr. at 291) cites drowsiness and dizziness from some of his medications, including Depakote, Abilify, Hydroxyzine, Celexa, and Prazosin. His father also stated that Mr. Harrison's medication caused him to be drowsy and sleep "too much." (Tr. at 273-74). But the only other inconsistencies the ALJ relied on for the credibility analysis concern Mr. Harrison's testimony about therapy and insurance, which made improper inferences against Mr. Harrison and have already been addressed. On balance, substantial evidence does not support the ALJ's decision to discount Mr. Harrison's credibility.

The ALJ's failure to fully develop the record evidence and properly evaluate Mr. Harrison's credibility also tainted the ALJ's assessment of his functional limitations from his severe mental impairments in determining his RFC. An ALJ is responsible for determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley*, 829 F.3d at 929.

The medical opinion evidence in this case does not constitute substantial evidence supporting the RFC determination. The only available examining opinion evidence comes from a 2016 consultative evaluation (Tr. at 426) and a 2016 vocational assessment (Tr. at 564), which significantly pre-date Mr. Harrison's alleged onset date. The ALJ also relied on administrative findings from state agency consultants Kay Cogbill, M.D. (Tr. at 133) and Sheri Simon, Ph.D. (Tr. at 150), which were authored in early 2019 as part of his Title II application and only assessed Mr. Harrison's RFC as of September 30, 2018, his date last insured. The record is devoid of opinion evidence from any of Mr. Harrison's treatment providers or even a consultative opinion applicable to the relevant time period, and the Court is mindful that "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Walker v. Comm'r*, 911 F.3d 550, 553 (8th Cir. 2018) (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)).

The ALJ found the 2016 assessments persuasive because they were based on objective examination and consistent with the medical evidence of record at the hearing level. But the amount of time that elapsed since these opinions were rendered, and the number of medically significant intervening events that occurred afterward—including three inpatient hospitalizations—make these opinions less persuasive. See *Naumann v. Kijakazi*, No. 4:20-cv-1048, 2022 WL 670134, at *8

(E.D. Mo. Mar. 7, 2022). Indeed, the Commissioner states that Dr. Couch's opinion is so remote that it "has no bearing on Plaintiff's functioning during the adjudicated period at issue in this case – September 30, 2018 (Plaintiff's amended alleged disability onset date) through April 30, 2020 (ALJ's decision date)." Def.'s Br. at 12.

Nevertheless, the ALJ claimed to rely on the opinion and characterized Dr. Couch's assessment as endorsing the notion that Mr. Harrison was "able to engage in basic work to completion but his mental conditions would cause a moderate limitation in persistence[,] pace, attention and concentration, typically triggered by being around too many people." (Tr. at 25). Mr. Harrison argues that the ALJ mischaracterized Dr. Couch's opinion evidence. The Court agrees. Far from finding that he could "engage in basic work to completion," Dr. Couch noted that Mr. Harrison's anxiety and panic would affect his attention, concentration, and capacity to cope with the typical mental and cognitive demands of work-like tasks, making it difficult to complete such tasks. (Tr. at 431). Meanwhile, she opined his depression would affect his ability to get to work, have the energy and motivation to complete the work, and capacity to sustain persistence in completing tasks and to do so within an acceptable timeframe. (Tr. at 431).

Dr. Couch's opinion accords with the 2016 psychological screening report by Dena Baker, M.S., describing Mr. Harrison's vocational limitations as low

frustration tolerance, low energy levels, difficulty relating to others, difficulty adapting to change, difficulty coping with pressure for production, impaired concentration, and ability to persist and complete tasks in a timely fashion, and exacerbations of his mental health symptoms in chronic stress or high-stress situations. (Tr. at 564).

Despite finding both of these opinions persuasive, the ALJ glossed over their findings and did not account for them in Mr. Harrison's RFC, including his impaired ability to get to work, to stay on task, to cope with stress and pressure for production, and to adjust to changes in routine. Had the ALJ properly assessed the examining opinion evidence, the outcome of the decision may have been different. See *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020) (ALJ's error in rejecting medical opinion was not harmless where VE testified claimant would be unemployable had RFC contained limitations from rejected opinion). At the hearing, the VE testified that Mr. Harrison would not be able to retain employment if, in addition to the other limitations in his RFC, he would be off-task up to 15% of the day. (Tr. at 90). The VE also testified that an inability to appropriately interact with supervisors, coworkers, or the general public, or to respond to routine work changes or changes in work settings, would lead to the same result. (Tr. at 91). These hypothetical limitations were not included in the RFC, but they correspond to findings the ALJ ignored in the examining opinions.

The state agency consultants found that Mr. Harrison had the capacity to perform unskilled work with moderate limitations in concentration, persistence, pace, and interacting with others. But these assessments, like the others, pre-dated the significant evidence of Mr. Harrison's period of decompensation in 2019. Moreover, the opinion of a non-examining consulting physician is generally given less weight than that of an examining source, and it is afforded less weight if the physician did not have access to relevant medical records, including relevant medical records that were made after the evaluation date. *McCoy v. Astrue*, 648 F.3d 605, 615-16 (8th Cir. 2011). Although these opinions are properly considered along with the medical evidence as a whole, they alone do not constitute substantial evidence supporting the ALJ's RFC determination.

However, there is no requirement that an RFC finding be supported by a specific medical opinion, *Hensley*, 829 F.3d at 932, and the ALJ did cite to Ms. Brinker's therapy notes from early 2019 as evidence that Mr. Harrison was capable of functioning in a work environment. During that time, he was able to "engage in some work-related activity on his Dad's farm" and was showing some improvement in his symptoms. (Tr. at 857). Mr. Harrison's ability to perform some work activity for his father does not necessarily translate to an ability to perform substantial gainful activity in a competitive work environment, particularly since Mr. Harrison was fired due to his anger issues just a few months later, and in the interim he had been

25

hospitalized twice for 7-day stints of inpatient mental health treatment. "[T]o find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). The ALJ failed to consider Mr. Harrison's ability to sustain these work activities over a period of time. These clinical notes do not provide substantial evidence to support the RFC. Similarly, normal clinical examination findings showing improvement during the course of Mr. Harrison's inpatient treatment are of limited relevance to his ability to work in the real world. The ALJ's mental RFC findings are not sufficiently supported by medical evidence of his ability to function in the workplace, or by substantial evidence in the record as a whole.

Based on the ALJ's errors in evaluating Mr. Harrison's mental impairments and in determining his RFC, the decision denying benefits should be reversed and the case remanded to the Commissioner for further consideration.

## IV.   CONCLUSION

For the reasons stated above, the Court finds that the Commissioner's decision is not supported by substantial evidence. The Court recommends that this case be reversed and remanded for further review.

IT IS SO ORDERED this 16th day of May, 2022.

_____
UNITED STATES MAGISTRATE JUDGE